UNITED STATES DISRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

WESSAM BOU-ASSALY,

     Plaintiff,                Case No.

vs

GEORGE P. MANN & ASSOCIATES, P.C.,
GEORGE P. MANN, MARGOLIS LAW, P.C.,
and LAURENCE H. MARGOLIS,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiff Wessam Bou-Assaly, through his attorneys, The Googasian Firm, P.C., alleges as follows:

### Nature of Action

1.    This attorney malpractice action arises from acts and omissions by immigration attorneys that caused a medical doctor who was a lawful permanent resident in the United States to be apprehended at the Detroit Metropolitan Airport in July 2015, detained in jail for more than a week, stripped of his green card and deported from the United States.

2.    As a result of the attorney malpractice, the medical doctor, his wife, and the couple's two young children, now cannot live together in the United States, where they had lived for many years prior to 2014 and intended to live permanently.

**Parties, Jurisdiction and Venue**

3.     Plaintiff Wessam Bou-Assaly is now domiciled in the United Arab Emirates. He has worked and lived with his family in the United Arab Emirates since July 2014. He holds citizenship in Canada and Lebanon. As a result of the acts and omissions giving rise to this action, Dr. Bou-Assaly, who was a lawful permanent resident, cannot enter the United States and live there with his wife, Nancy Hage, who is a citizen of the United States and Lebanon, and their children.

4.     As a result of the acts and omissions giving rise to this action, Dr. Bou-Assaly and Ms. Hage have an intent to remain in the United Arab Emirates indefinitely because Dr. Bou-Assaly cannot enter the United States and Dr. Bou-Assaly has employment in the United Arab Emirates.

5.     As a result of the acts and omissions giving rise to this action, Dr. Bou-Assaly, Ms. Hage and their children cannot return together to Michigan, nor can they live together anywhere in the United States.

6.     Defendant George P. Mann & Associates, P.C. ("the Mann Firm") is a Michigan professional corporation engaged in the practice of law in Michigan with its principal place of business in this judicial district.

7.     Defendant George P. Mann is an attorney licensed to practice law in Michigan, and is domiciled in Michigan. At all relevant times, Mr. Mann was an actual or ostensible agent of the Mann Firm.

2

8.     Defendant Margolis Law, P.C. ("the Margolis Firm"), upon information and belief, is a Michigan professional corporation engaged in the practice of law in Michigan with its principal place of business in this judicial district.

9.     Defendant Laurence H. Margolis is an attorney licensed to practice law in Michigan, and is domiciled in Michigan. At all relevant times, Mr. Margolis was an actual or ostensible agent of the Margolis Firm.

10.     The amount in controversy exceeds $75,000.

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2).

12.     This Court has venue over this action pursuant to 28 U.S.C. §1391(b)(1) and 28 U.S.C. §1391(b)(2).

## Common Allegations

### Dr. Bou-Assaly and Ms. Hage lived and worked in Michigan

13.     Dr. Bou-Assaly and Ms. Hage each emigrated from Lebanon as young people.

14.     As a young person, Dr. Bou-Assaly moved to Canada, where he gained citizenship.

15.     As a young person, Ms. Hage moved to California, and she became a naturalized United States citizen when she turned 18.

3

16.     In 2004, Dr. Bou-Assaly came to the United States on a so-called J-1 visa in connection with a neuroradiology fellowship at Indiana University.

17.     In 2007, Dr. Bou-Assaly obtained a so-called H-1B visa in connection with positions that he accepted at the University of Michigan and the Veterans Administration Hospital ("the VA") in Ann Arbor.

18.     In 2009, Dr. Bou-Assaly and Ms. Hage were married.

19.     In 2010, Dr. Bou-Assaly obtained a so-called green card as a lawful permanent resident in the United State that was valid until 2020.

20.     In 2013, Dr. Bou-Assaly had commenced procedural steps to become a naturalized citizen in the United States.

21.     As of 2013, Dr. Bou-Assaly and Ms. Hage were living and working in the Ann Arbor area, where they owned a home. The couple had one young son. Dr. Bou-Assaly continued to work at University of Michigan and the VA as a medical doctor, and Ms. Hage was in a fully funded doctoral program at Eastern Michigan University's psychology department.

**Dr. Bou-Assaly faced misdemeanor criminal charges**

22.     In 2014, Dr. Bou-Assaly was accused by a fellow doctor at the VA of inappropriate conduct of a sexual nature.

23.     The accusation led to an investigation and to misdemeanor criminal charges being filed against Dr. Bou-Assaly in state district court.

4

24.    In connection with the investigation and the charges, Dr. Bou-Assaly was terminated from his position at the VA and resigned from his position at University of Michigan.

25.    Dr. Bou-Assaly retained a criminal defense attorney, Joseph A. Simon, to represent his interests with regard to the misdemeanor criminal charges.

26.    Throughout the course of his criminal case, Dr. Bou-Assaly made clear to Mr. Simon that he wanted to take steps to avoid any change in his immigration status as a lawful permanent resident.

**The Margolis Firm provided legal advice**
**regarding the criminal case and**
**Dr. Bou-Assaly's immigration status as lawful permanent resident**

27.    Mr. Simon referred Dr. Bou-Assaly to Mr. Margolis and the Margolis Firm for legal advice on his immigration status as a lawful permanent resident in connection with the criminal case.

28.    Mr. Simon advised Dr. Bou-Assaly that legal advice regarding the impact of the criminal case on his immigration status as a lawful permanent resident should be provided by Mr. Margolis, not Mr. Simon.

29.    Mr. Margolis and the Margolis Firm represent that they have "significant experience representing non citizens in state criminal cases" pertaining to their immigration status.

30.     Mr. Margolis and the Margolis Firm also represent that "in *crimmigration* cases, in the criminal trial court or those in immigration court, we are hired by the client, the criminal attorney or the immigration attorney. We then work to protect the client's ability to remain in the US lawfully and, if applicable, keep valid the client's permanent resident or 'green card' status in the United States."

31.     Dr. Bou-Assaly retained Mr. Margolis and the Margolis Firm to provide legal advice on the extent to which the criminal case could adversely affect his immigration status as a lawful permanent resident who was seeking to become a naturalized citizen.

32.     Dr. Bou-Assaly and Ms. Hage proceeded to confer with Mr. Margolis about the criminal cases and Dr. Bou-Assaly's immigration status as a lawful permanent resident.

33.     One such communication among Mr. Margolis, Dr. Bou-Assaly and Ms. Hage occurred on or about April 24, 2014, when Dr. Bou-Assaly was presented with a no-contest plea deal to a single reduced charge of attempted sexual conduct – 4th degree, with all other charges dismissed.  Pursuant to the plea deal, Dr. Bou-Assaly was to receive probation without any imposition of "up-front" jail time, which meant he could only be sent to jail if he violated terms of probation.

34.     The plea deal that was offered to Dr. Bou-Assaly on or about April 24, 2014, was a so-called *Cobbs* agreement, which refers to a type of a plea agreement

in which a criminal defendant is offered a preview of the sentence to be rendered in the event of a plea of guilty or no contest to a charge. Under a *Cobbs* agreement, a criminal defendant can elect to withdraw his plea and proceed to trial if a court does not impose the sentence that the defendant had agreed to when it was previewed at the plea stage.

35.     Mr. Margolis advised Dr. Bou-Assaly and Ms. Hage that accepting the plea deal offered on April 24, 2014 would not adversely affect Dr. Bou-Assaly's immigration status as a lawful permanent resident in any way.

36.     Based on Mr. Margolis's advice, Dr. Bou-Assaly accepted the plea deal.

37.     During an April 24, 2014 hearing with regard to the plea, a state district court judge stated in the plea agreement colloquy that the sentence for a no-contest plea to a charge of attempted criminal sexual conduct in the 4th degree would include "no up-front jail time."

38.     During the April 24, 2014 plea hearing, Dr. Bou-Assaly confirmed on the record that he had discussed the possible consequence of the plea with an immigration attorney, referring to Mr. Margolis.

39.     Mr. Margolis never advised Dr. Bou-Assaly and Ms. Hage that some jail terms that were not "up-front" could adversely affect his immigration status as a lawful permanent resident.

7

40.     Mr. Margolis never advised Dr. Bou-Assaly and Ms. Hage that a suspended jail sentence – i.e., one that is not "up-front"– could adversely affect his immigration status as a lawful permanent resident if the duration of the suspended sentence was more than six months.

41.     Mr. Margolis did not attend the sentencing hearing on June 13, 2014 or review the sentencing documents created by the state district court after the plea hearing.

**The Mann Firm also provided legal advice
to Dr. Bou-Assaly regarding the criminal case
and his immigration status as a lawful permanent resident**

42.     Following the plea hearing on April 24, 2014, Dr. Bou-Assaly and Ms. Hage received additional legal advice from the Mann Firm regarding the potential consequences of the plea deal on Dr. Bou-Assaly's ability to re-enter the United States in connection with a prospective job overseas.

43.     After the plea hearing, Dr. Bou-Assaly had asked Mr. Margolis whether there would be any adverse impact on his immigration status as a lawful permanent resident if he took a job overseas for a period of time beginning in the summer of 2014.

44.     In response, Mr. Margolis indicated to Dr. Bou-Assaly that there might be "re-entry issues" and that he would recommend applying for a "waiver."

8

45.     Mr. Margolis subsequently recommended that Dr. Bou-Assaly contact an attorney at the Mann Firm to discuss application for a waiver with regard to overseas employment following his forthcoming sentence.

46.     Dr. Bou-Assaly then retained Mr. Mann and the Mann Firm to provide legal advice on the extent to which the criminal case could adversely affect his immigration status as a lawful permanent resident who was considering working overseas for a limited period of time.

47.     On or about May 14, 2014, prior to the sentencing, Dr. Bou-Assaly met with Mr. Mann at the Mann Firm.

48.     By e-mail on or about May 19, 2014, Mr. Mann subsequently advised Dr. Bou-Assaly that he would not be inadmissible if he left the country for work and then returned to the United States, and that he would not need any waivers to return to the U.S.

49.     Mr. Mann further advised Dr. Bou-Assaly that he should plan to carry a record of his conviction to present to border officials upon his return to the United States.

50.     Mr. Mann never advised Dr. Bou-Assaly that a suspended jail sentence could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country if the duration of the suspended sentence was more than six months.

9

51.     Based on the advice initially provided by Mr. Margolis and the advice subsequently provided by Mr. Mann, Dr. Bou-Assaly decided to accept a job in the United Arab Emirates and move his family there for approximately one year beginning in the summer of 2014, provided that the terms of his probation in his forthcoming sentencing hearing allowed him to leave the country.

**Before Dr. Bou-Assaly left the country in July 2014,
neither Mr. Margolis nor Mr. Mann advised him
that there was any problem with or defect in
any record relating to his sentence**

52.     On or about June 13, 2014, Dr. Bou-Assaly attended a hearing in state district court for imposition of his sentence following the earlier hearing with regard to the no-contest plea entered pursuant to a *Cobbs* agreement.

53.     Neither Mr. Margolis nor Mr. Mann attended the sentencing hearing.

54.     At the sentencing hearing, the state district judge stated that Dr. Bou-Assaly would receive a sentence of 24 months of probation and would be permitted to leave the country during the probation period for the overseas job. The judge also stated that a 365-day jail sentence would be suspended.

55.     Neither Mr. Margolis nor Mr. Mann had advised Dr. Bou-Assaly or Ms. Hage that the imposition of a suspended sentence of a particular duration or the inclusion of such a sentence on a conviction record could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country in state district court.

10

56.     Following the hearing, Dr. Bou-Assaly was provided a record of his sentence by the state probation department.

57.     The record of sentence provided to Dr. Bou-Assaly stated in part that Dr. Bou-Assaly's term of probation was 24 months, and that "Defendant shall" serve 365 days in jail, with 365 days suspended.

58.     On or about June 19, 2014, Dr. Bou-Assaly sent a copy of the record of his sentence reflecting in part that "Defendant shall" serve 365 days in jail, with 365 days suspended, to Mr. Mann as an attachment to an e-mail.  Dr. Bou-Assaly's e-mail stated in part that Mr. Mann had asked Dr. Bou-Assaly to send him a record regarding his sentencing.

59.     After receipt of the record of sentence provided by Dr. Bou-Assaly, Mr. Mann advised Dr. Bou-Assaly that, upon his re-entry to the United States after working overseas, he should present the record of sentence that Dr. Bou-Assaly had sent him along with a copy of a May 2014 e-mail from Mr. Mann to Dr. Bou-Assaly indicating that no waiver of inadmissibility was needed.

60.     Mr. Mann never advised Dr. Bou-Assaly that a record of sentence containing a reference to a 365-day jail sentence would adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country.

11

61.    Mr. Margolis also never advised Dr. Bou-Assaly that a record of sentence containing reference to a 365-day jail sentence would adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country.

62.    Upon information and belief, Mr. Margolis did not review a record of sentence relating to Dr. Bou-Assaly after advising Dr. Bou-Assaly that his no-contest plea in the criminal case would not adversely affect his immigration status.

**Based on the immigration advice from Mr. Margolis and Mr. Mann, Dr. Bou-Assaly and Ms. Hage temporarily moved overseas**

63.    Based on the immigration advice received from Mr. Margolis and Mr. Mann, Dr. Bou-Assaly and Ms. Hage decided to move temporarily in July 2014 to the United Arab Emirates, where Dr. Bou-Assaly could work as a radiologist.

64.    The couple would not have made the decision to move if they had been advised by Mr. Margolis or Mr. Mann that the record of sentence in the criminal case could adversely affect Dr. Bou-Assaly's immigration status as a lawful permanent resident or Dr. Bou-Assaly's ability to re-enter the country.

65.    The couple rented their home in Ann Arbor to others.

66.    Ms. Hage took a one-year leave of absence from her fully funded Ph.D. program at Eastern Michigan University.

67.    In July 2014, Dr. Bou-Assaly and Ms. Hage flew to the United Arab Emirates with their young son, who had been born and always lived in the United

States, for an anticipated stay of approximately one year in the United Arab Emirates.

68.     Thereafter, Dr. Bou-Assaly periodically communicated with the Mann Firm about immigration issues relating to his status as a lawful permanent resident and his goal of becoming a naturalized U.S. citizen.

### In early July 2015, Mr. Margolis reached out to Dr. Bou-Assaly, but he did not share concerns about the sentence that Dr. Bou-Assaly had received

69.     About one year later, on July 3, 2015, Mr. Margolis sent an e-mail to Dr. Bou-Assaly stating, "Hello Wessam, I saw you in the paper here today. Are you still in the US?"

70.     Mr. Margolis referred in the e-mail to Dr. Bou-Assaly to a news report published on July 2, 2015, by mlive.com relating to Dr. Bou-Assaly's criminal case and medical license.

71.     The news report stated in part that "[i]n June 2014, Bou-Assaly was sentenced to one year in jail, but with a suspended sentence and two years of probation."

72.     In response to Mr. Margolis's e-mail, Dr. Bou-Assaly stated in part that he was "planning to come back to the U.S."

73.     Upon information and belief, Mr. Margolis was prompted to reach out to Dr. Bou-Assaly because he knew that a one-year jail sentence, even if it was suspended, could adversely affect his ability to re-enter the country.

74.     However, Mr. Margolis did not communicate any concern to Dr. Bou-Assaly about any aspect of the sentence described in the MLive story, including the one-year jail sentence.

75.     Mr. Margolis also did not take any steps at the time to correct any perceived problem with the sentence or to notify Dr. Bou-Assaly or Ms. Hage regarding any perceived problem.

76.     At the time, neither Dr. Bou-Assaly nor Ms. Hage had any understanding that a one-year suspended jail sentence could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country.

**Dr. Bou-Assaly's criminal case was closed in July 2015**

77.     On or about July 16, 2015, Mr. Simon notified Dr. Bou-Assaly via e-mail that his criminal case had been concluded following a one-year review by the state district court regarding his compliance with terms of probation.  Mr. Simon's e-mail stated in part, "Your probation concluded and your case was closed . . . . Congratulations."

14

78.     Dr. Bou-Assaly promptly forwarded Mr. Simon's e-mail to Mr. Mann and notified him that he would be returning to Michigan later in July 2015 to participate in a proceeding relating to his medical license.

79.      In the e-mail to Mr. Mann, Dr. Bou-Assaly reiterated that Mr. Mann had advised him that "nothing is needed to enter" the United States because his no contest plea was to a misdemeanor.

**In July 2015, prior to making a planned return visit to Michigan, Dr. Bou-Assaly communicated again with Mr. Mann**

80.     Later in July 2015, after slightly more than one year working in the United Arab Emirates, Dr. Bou-Assaly and Ms. Hage made final arrangements for a return visit to the United States with their two children – their young son who had moved with them during the previous year and their newborn son who had just been born in the United Arab Emirates.

81.     Their planned visit was to include Dr. Bou-Assaly's attendance at a proceeding relating to suspension of his medical license due to the criminal case, Ms. Hage's participation in meetings with colleagues at Eastern Michigan University where she was nearing the end of a one-year leave, and their making arrangements for a move back to Michigan from the United Arab Emirates later in the summer of 2015.

82.     Prior to their scheduled return visit, Dr. Bou-Assaly communicated again with Mr. Mann.

15

83.    In an e-mail sent on or about July 20, 2015, Dr. Bou-Assaly informed Mr. Mann that he would in a matter of days be arriving back at Detroit Metropolitan Airport with his wife and two children.

84.    The e-mail to Mr. Mann stated in part that "[b]efore I left the USA last year we had that discussion . . . regarding the NO NEED of a waiver" and that "[w]e agreed that I inform you when I will travel back to the US to keep your office aware if needed some help getting in." Dr. Bou-Assaly also inquired again in the e-mail as to what documents he should carry with him upon arrival in Detroit.

85.    In response, Mr. Mann confirmed again that Dr. Bou-Assaly did not need any immigration waiver of any kind and told him that his associate Albert Valk was aware that he might be contacted "if any issues arise."

86.    Based on the advice given by Mr. Mann, Dr. Bou-Assaly and Ms. Hage made sure that he had in his possession at the time of the family's trip back to Michigan the sentencing document from June 13, 2014 that he had previously sent to Mr. Mann, and a copy of a May 2014 e-mail from Mr. Mann stating that he did not need a waiver of inadmissibility. In addition, Dr. Bou-Assaly had his green card as well as a so-called I-131 permit that Dr. Bou-Assaly had previously obtained with the assistance of Mr. Mann's office to demonstrate that he was a green card holder who had traveled outside the United States for more than one year.

16

**After arriving at the Detroit airport,**
**Dr. Bou-Assaly was apprehended and jailed**

87.     Upon arrival at Detroit Metropolitan Airport with his wife and two children on the morning of July 24, 2015, Dr. Bou-Assaly presented documentation at customs, including the June 2014 record of sentence and a May 2014 e-mail that Mr. Mann had instructed him to show in these circumstances.

88.     Dr. Bou-Assaly was then directed to an office where he and his family were held for approximately eight hours.

89.     Thereafter, Dr. Bou-Assaly was fingerprinted by customs officials, and then shackled at the hands and feet before being led away.

90.     Dr. Bou-Assaly was transported to the Dearborn Police Department, where he was placed in isolation.  Officials proceeded to hold Dr. Bou-Assaly in isolation at the Dearborn Police Department for approximately 72 hours.

91.     Amidst these chaotic events, Ms. Hage contacted the Mann Firm for additional legal advice.

92.     Ms. Hage received legal advice from Mr. Valk, the associate at Mr. Mann's office whom Mr. Mann had instructed them to contact if the need arose.

93.     On the morning of July 25, 2015, Ms. Hage met with Mr. Valk at the offices of the Mann Firm.

94.     Mr. Valk provided documents to Ms. Hage that the Mann Firm had prepared for her.

17

95.    Mr. Valk acknowledged in the meeting that the Mann Firm had made a mistake and that Dr. Bou-Assaly was encountering "the worst experience of his life."

96.    In subsequent communications, Ms. Hage asked Mr. Valk to come visit Dr. Bou-Assaly at the Dearborn Police Department, but Mr. Valk indicated that he did not have authorization from Mr. Mann to do so.

97.    Mr. Mann was aware of the immigration crisis that Dr. Bou-Assaly and Ms. Hage were experiencing, but elected not to communicate directly with them in person or otherwise about what could or should be done to help resolve the problems.

98.    On or about July 27, 2015, following three days in detention in Dearborn, Dr. Bou-Assaly was transported to the Calhoun County jail in a van with his wrists chained behind his back and his ankles shackled to the floor. Officials proceeded to hold Dr. Bou-Assaly in the jail for more than one week.

**Dr. Bou-Assaly and Ms. Hage learned that the immigration problem related to the criminal sentence reflecting a one-year suspended jail term**

99.    During the chaotic events following their return to the United States, Dr. Bou-Assaly and Ms. Hage learned that immigration officials had determined that Dr. Bou-Assaly was inadmissible for re-entry to the United States based on the record of his sentence reflecting a 365-day suspended jail sentence.

100.    Following Dr. Bou-Assaly's arrest upon his return to the United Sates, the couple learned for the first time that because his record of the sentence reflected

18

a 365-day jail sentence (regardless of the sentence having been suspended), Dr. Bou-Assaly was inadmissible for re-entry to the country without a waiver.

101.   Neither the Margolis Firm nor the Mann Firm had ever advised Dr. Bou-Assaly or Ms. Hage that a suspended jail sentence of 365 days reflected on a judgment could adversely affect Dr. Bou-Assaly's immigration status as a lawful permanent resident or his ability to re-enter the country.

102.   Neither the Margolis Firm nor the Mann Firm had recommended to Dr. Bou-Assaly that he obtain a waiver of inadmissibility due to the 365-day suspended jail sentence prior to attempting to re-enter the country.

103.   Neither the Margolis Firm nor the Mann Firm had recommended to Dr. Bou-Assaly that he seek to amend the judgment in the state district court due to its reference to a 365-day suspended jail sentence.

104.   Even after receiving a copy of the order of probation reflecting a 365-day suspended sentence on or about June 19, 2014, Mr. Mann had failed to advise Dr. Bou-Assaly and Ms. Hage that a suspended sentence of that duration could adversely affect Dr. Bou-Assaly's ability to re-enter the country.

105.   To the contrary, Mr. Mann had advised Dr. Bou-Assaly following his receipt of the order of probation on or about June 19, 2014, that Dr. Bou-Assaly did not need a waiver or any other relief to re-enter the country.

19

106.   Even after becoming aware of Dr. Bou-Assaly's one-year suspended jail sentence as a result of the publication of the MLive story on July 2, 2015, Mr. Margolis had failed to advise Dr. Bou-Assaly or Ms. Hage to seek a waiver or to amend the record of sentence prior to attempting to re-enter the country.

**Ms. Hage retains new attorneys to assist Dr. Bou-Assaly**

107.   Unable to arrange for Mr. Mann, Mr. Valk or anyone else at the Mann Firm to visit Dr. Bou-Assaly or otherwise communicate with him after he was taken into custody by immigration officials, Ms. Hage retained another immigration attorney, Mohammed Al-Sharnouby, to represent Dr. Bou-Assaly in forthcoming immigration proceedings.

108.   After Mr. Simon advised that he did not handle any post-conviction relief in criminal cases, Ms. Hage also retained another attorney, Stephen Linden, to seek to modify the criminal sentence that was the source of Dr. Bou-Assaly's immigration problem upon return to the United States.

109.   On or about July 30, 2015, Mr. Linden's firm submitted a motion to set aside and/or modify the judgment in the criminal case in the 15th District Court from June 2014.

110.   The filing seeking to set aside or modify the judgment noted that Mr. Margolis had advised Dr. Bou-Assaly on the immigration ramifications of the criminal case. It further stated in part that "it was only after counsel represented to

the Defendant that there would be no ramifications regarding his immigration status that he entered a plea of no-contest to the added charge of [attempted] criminal sexual conduct fourth degree. Unfortunately, for the Defendant, this was totally incorrect and the Defendant was arrested . . . for . . . the conviction in this matter with a sentence of one year in jail."

## Dr. Bou-Assaly is deported from the United States

111.   On August 4, 2015 at an immigration removal proceeding in Detroit, an immigration judge ordered that Dr. Bou-Assaly be deported to Canada or in the alternative to Lebanon.

112.   One of the documents relating to the removal proceeding filed by U.S. immigration officials stated that Dr. Bou-Assaly was "not in possession of a valid waiver" relating to his criminal conviction.

113.   Dr. Bou-Assaly was stripped of his green card and any right to enter the United States.

114.   Following Dr. Bou-Assaly's stunning removal from the United States, Dr. Bou-Assaly, Ms. Hage and their two small children returned to the United Arab Emirates, where they are now continuing to live.

115.   Dr. Bou-Assaly sustained physical injuries, including, but not limited to, a rotator cuff injury and a skin infection, during his detention in the United States.

## Dr. Bou-Assaly's criminal sentence later is corrected

116.   In the aftermath of Dr. Bou-Assaly's removal from the United States in August 2015, the state district court proceeded to consider the motion to set aside or modify the judgment filed in the criminal case while Dr. Bou-Assaly was still being detained in the Calhoun County jail.

117.   At a hearing on November 13, 2015, Mr. Margolis testified under oath, stating in part that the purpose of his retention was to advise Dr. Bou-Assaly "generally on what he may need immigration-wise as a result of the plea."

118.   Mr. Margolis testified that he was sure that Dr. Bou-Assaly had relied on his advice prior to entering a plea of no contest in a *Cobbs* agreement.

119.   Mr. Margolis testified that he "subsequently" found out that the sentence entered following the no-contest plea included "one year in jail, suspended."

120.   Mr. Margolis testified that "I believe what happened was . . . that he was not able to come back to the country, rendering him what's called inadmissible due to the plea."

121.   Mr. Margolis testified that "[t]he issue in this case was the disconnect between me not telling him . . . the one year suspended sentence could have ramifications."

22

122.    Mr. Margolis testified, "I probably should have told Joe [Simon] make sure you have that sentence clear; that it's not jail of any sort, even if it's suspended."

123.    Mr. Margolis testified, "even if it's suspended, immigration treats it as an actual sentence of incarceration."

124.    Mr. Margolis testified, "I should have stayed on after the plea and gone to sentencing."

125.    Following the hearing in which Mr. Margolis testified, the state district court entered on December 14, 2015, an opinion and order modifying the sentence.

126.    The court found that "inclusion of the suspended jail term in the Judgment of Sentence was a mistake by the sentencing Judge. It was a probationary term, not a sentence to jail, and did not belong in the Judgment [o]f Sentence."

127.    Accordingly, the court ordered an amended judgment of sentence that omitted any reference to a term of jail as having been included in the sentence.

**Dr. Bou-Assaly and Ms. Hage are now domiciled in the United Arab Emirates**

128.    Dr. Bou-Assaly, Ms. Hage and their young children are now domiciled in the United Arab Emirates.

129.    Because Dr. Bou-Assaly cannot enter the United States, Dr. Bou-Assaly, Ms. Hage and their family cannot now live and work in the United States.

130.    At present, Dr. Bou-Assaly and Ms. Hage do not currently know whether the amended judgment entered in December 2015, more than four months

23

after his removal from the United States, will affect his current status as an alien who no longer holds a green card and has been deemed inadmissible in the United States.

### Count I – Attorney Malpractice – Mr. Mann and the Mann Firm

131.    Plaintiff incorporates by reference the preceding allegations.

132.    At all relevant times, an attorney/client relationship existed between Mr. Mann and the Mann Firm, on the one hand, and Dr. Bou-Assaly, on the other hand.

133.    Agents and employees of the Mann Firm, including Mr. Mann and Mr. Valk, provided legal advice to Dr. Bou-Assaly during the course of attorney/client relationship.

134.    At all relevant times, Mr. Mann and Mr. Valk were agents and/or employees of the Mann Firm.

135.    At all relevant times, Mr. Mann, Mr. Valk and the Mann Firm owed a duty to Dr. Bou-Assaly to render and provide legal services relating to immigration issues in conformance within the acceptable standard of practice for lawyers in the community and to refrain from acts of professional negligence.

136.    Mr. Mann, Mr. Valk and the Mann Firm negligently breached their duty in numerous ways, including, but not limited to the following:

a. By failing to advise that Dr. Bou-Assaly's sentence pursuant to a plea agreement could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country;

b. By failing to advise that the duration of any suspended sentence is considered by immigration authorities;

c. By failing to advise that Dr. Bou-Assaly's record of sentence could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country;

d. By failing to advise that Dr. Bou-Assaly should seek to correct or amend the record of sentence because it could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country;

e. By failing to advise that Dr. Bou-Assaly should seek to obtain a waiver of inadmissibility due to the record of sentence prior to attempting to re-enter the United States;

f. By advising Dr. Bou-Assaly that he did not need to obtain a waiver of inadmissibility to re-enter the United States;

g. By failing to take steps to assist Dr. Bou-Assaly when he was detained and facing immigration removal proceedings beginning in late July 2015;

h.  By acting in other ways to be revealed in discovery; and

i.  By failing to act in other ways to be revealed in discovery.

137.  As a direct and proximate result of the negligence of Mr. Mann, Mr. Valk and the Mann Firm, Dr. Bou-Assaly sustained damage, including, but not limited to, the loss of liberty, the loss of the ability to live together as a family in the United States, the loss of the ability to work in the United States, the loss of the ability to raise their children in the United States, the incurrence of substantial expense, physical injury to Dr. Bou-Assaly and mental distress.

WHEREFORE, Plaintiff demands judgment against Defendants in the amount to which they are entitled, plus costs, interest and other relief that the Court deems just.

### Count II – Attorney Malpractice – Mr. Margolis and the Margolis Firm

138.  Plaintiff incorporates by reference the preceding allegations.

139.  At all relevant times, an attorney/client relationship existed between Mr. Margolis and the Margolis Firm, on the one hand, and Dr. Bou-Assaly, on the other hand.

140.  Agents and employees of the Margolis Firm, including Mr. Margolis, provided legal advice to Dr. Bou-Assaly during the course of attorney/client relationship.

26

141.   At all relevant times, Mr. Margolis was an agent and employee of the Margolis Firm.

142.   At all relevant times, Mr. Margolis and the Margolis Firm owed a duty to Dr. Bou-Assaly to render and provide legal services relating to immigration issues in conformance with the acceptable standard of practice for lawyers in the community and to refrain from acts of professional negligence.

143.   Mr. Margolis and the Margolis Firm negligently breached their duty in numerous ways, including, but not limited to the following:

    a.   By failing to advise that Dr. Bou-Assaly's sentence pursuant to a plea agreement could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country;

    b.   By failing to advise that the duration of any suspended sentence is considered by immigration authorities;

    c.   By failing to stay on after the plea and by failing to go to sentencing with Dr. Bou-Assaly;

    d.   By failing to review Dr. Bou-Assaly's record of sentence  at the time of its entry to consider whether it could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country;

27

e.  By failing to advise that Dr. Bou-Assaly's sentence could adversely affect his immigration status as a lawful permanent resident  or his ability to re-enter the country;

f.  By failing to advise that Dr. Bou-Assaly should seek to correct or amend the record of sentence because it could adversely affect his immigration status as a lawful permanent resident or his ability to re-enter the country;

g.  By failing to advise that Dr. Bou-Assaly should seek to obtain a waiver of inadmissibility prior to attempting to re-enter the United States, after learning about the one-year suspended sentence in early July 2015;

h.  By acting in other ways to be revealed in discovery; and

i.  By failing to act in other ways to be revealed in discovery.

144.  As a direct and proximate result of the negligence of Mr. Margolis and the Margolis Firm, Dr. Bou-Assaly sustained damage, including, but not limited to, the loss of liberty, loss of the ability to live together as a family in the United States, the loss of the ability to work in the United States, the loss of the ability to raise their children in the United States, the incurrence of substantial expense, physical injury to Dr. Bou-Assaly and mental distress.

WHEREFORE, Plaintiff demands judgment against Defendants in the amount to which they are entitled, plus costs, interest and other relief that the Court deems just.

THE GOOGASIAN FIRM, P.C.

By: /s/ Thomas H. Howlett
Attorneys for Plaintiff
6895 Telegraph Road
Bloomfield Hills, Michigan 48301
(248) 502-0862
Dated: January 3, 2017          thowlett@googasian.com

## JURY DEMAND

Plaintiff Wessam Bou-Assaly, through his attorneys, The Googasian Firm, P.C., hereby demand a trial by jury in this action.

THE GOOGASIAN FIRM, P.C.

By: /s/ Thomas H. Howlett
Attorneys for Plaintiff
6895 Telegraph Road
Bloomfield Hills, Michigan 48301
(248) 502-0862
Dated: January 3, 2017          thowlett@googasian.com

29